IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DEANN ROBERSON,
Plaintiff,

v.

Case No. 19–CV–00389–JPG–MAB

ANDREW SAUL,
Commissioner of Social Security,
Defendant.

## **MEMORANDUM & ORDER**

This is a Social Security disability appeal. Before the Court is Plaintiff Deann Roberson's Brief. (ECF No. 23). Defendant Andrew Saul, Commissioner of Social Security, responded. (ECF No. 36). For the reasons below, the Court **AFFIRMS** the Commissioner's disability decision.

### I. PROCEDURAL & FACTUAL HISTORY

Roberson first applied for Social Security Disability Insurance Benefits and Supplemental Security Income in 2014. (Tr. 15, ECF No. 15). She alleged an onset date—when she first became disabled—of August 2013, and she did not claim a "closed period" of disability (*i.e.*, a period of disability with a definite end date). (*Id.* at 241). The Social Security Administration denied both applications in July 2014 and denied reconsideration. (*Id.* at 15). Roberson then made a written request for a hearing before an administrative law judge ("ALJ"). (*Id.*). She also amended her onset date to January 2015. (*Id.* at 15, 240).

#### A. Vocational & Medical History

Roberson worked as a transportation security officer for six-and-a-half years before being laid off in 2013. (*Id.* at 44). She then worked as a housekeeper for about a year, but she stopped working due to anxiety, depression, and chronic pain in her lower back and left leg. (*Id.* at 46).

Roberson underwent three surgeries to remedy her back pain. The first was a lumbar microdiscectomy at L4–5 in January 2015.[1] (*Id.* at 647). Two months later, she told her treating physician that she was feeling "significantly better than she was before" and that she was "very pleased with the results of the surgery." (*Id.* at 801). But the pain returned by November, and an MRI showed "recurrent disc herniation at L4–5 . . . ." (*Id.* at 1297). Her physician informed her that if she went through a second surgery, there was "a 60% chance of being pain free after surgery and a 30% chance of have a major reduction in pain but not necessarily pain free, but the two combining to give a chance of a good outcome 90%." (*Id.* at 1300).

So in March 2016, Roberson underwent a second lumbar microdiscectomy at L4–5. (*Id.*). Her physician told her that she could resume normal activity with no restrictions after six weeks. (*Id.* at 1409). But one month later, Roberson returned to the emergency room complaining of decreased sensation in her left leg. (*Id.* at 881). Her physician determined that the second surgery caused left foot drop.[2] (*Id.*).

In August, she underwent a third surgery: a transforaminal lumbar interbody fusion of L4–5.[3] For a while, it seemed that the surgery succeeded. By January 2017, a CT scan "demonstrate[d] good evidence of early bone fusion . . . ." (*Id.* at 1449). "She state[d] that her radicular pain has been relieved completely in the L5 distribution on the left" but "that she has some pain in the mid thoracic region and some difficulty with her cervical spine range of motion." (*Id.* at 1448). Her

---

[1] A microdiscectomy is "[a] surgical procedure performed with the aid of a microscope, in which part of or all of an intervertebral disk is removed." *Microdiscectomy*, Attorney's Dictionary of Medicine (2019). The procedure here involved the disk between the fourth and fifth lumbar vertebra.

[2] Foot drop is the "inability to bend the forward portion of the foot upward, toward the shin, due to weakness or paralysis of the involved muscles." *Foot Drop*, Attorney's Dictionary of Medicine (2019).

[3] A transforaminal lumbar interbody fusion is "[a] method of performing spinal fusion (joining of adjacent vertebrae to one another) through a posterior approach, through the lateral portion of the vertebral foramen (the central opening in a vertebra through which the spinal cord passes)." *Transforaminal Lumbar Interbody Fusion*, Attorney's Dictionary of Medicine (2019). Again, the procedure here involved the disk between the fourth and fifth lumbar vertebra.

physician told her to return "on an as-need basis," and he was "delighted at the excellent recovery she has had from surgery . . . ." (*Id.* at 1449).

### B. Hearing & Decision

An ALJ conducted a hearing in October 2017. (*Id.* at 15, 240). Roberson testified that she still experiences chronic pain in her lower back and left leg that limits her movement. (*Id.* at 46). As a result, she stated that she cannot sit for more than 20 to 30 minutes before her "lower extremities go numb." (*Id.* at 47). She questioned the accuracy of a 2016 physician's note that suggested significant improvement after the third surgery: "It helped to the point where . . . I'm not hunched over but other than that I still have the pain and the nerve damage." (*Id.* at 54). Finally, she testified that her average day consists of chores around the house, like cooking, washing laundry, and cleaning dishes; but she has trouble vacuuming because of the motions involved. (*Id.* at 51). She takes a 10- to 15-minute break between chores and spends the rest of the day watching television and socializing with her boyfriend. (*Id.* at 51, 54–55).

In March 2018, after applying the five-step analysis used to determine whether an applicant is disabled, *see* 20 C.F.R. § 404.1520(a), the ALJ concluded that Roberson is not disabled, (Tr. 15). At Step 1, the ALJ determined that Roberson has not engaged in substantial gainful activity since her alleged onset date in 2015. (*Id.* at 17). At Step 2, the ALJ evaluated Roberson's conditions and concluded that she is suffering from the following severe impairments: "lumbar degenerative disc disease with radiculopathy status-post fusion, depression, anxiety, bipolar disorder, and post-traumatic stress disorder . . . ." (*Id.*). At Step 3, however, the ALJ determined that these impairments do not meet the statutory listing for presumptive disability. (*Id.* at 17–19).

In evaluating Roberson's residual functional capacity at Step 4, the ALJ determined that Plaintiff can still perform light work. (*Id.* at 19–25). Although Roberson's impairments could

reasonably cause the symptoms she complains about (*i.e.*, chronic back and leg pain), the ALJ found that her subjective reports about the intensity, persistence, and limiting effects of those symptoms are "not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.* at 20–21).

At Step 4, the ALJ considered three assessments that Roberson submitted to the Social Security Administration in 2014 and 2015. The first assessment was completed by her friend of ten years in 2014. (*Id.* at 265). She attested that Roberson performs "light physical housework" and "keeps up her hygiene." (*Id.* at 266). She also stated that Roberson still socializes, both in person and electronically, and goes grocery shopping every week. (*Id.* at 269). Finally, she asserted that Roberson can walk for 15 minutes without needing a break. (*Id.* at 270).

Roberson also completed the same assessment on herself in 2014. (*Id.* at 273). She checked the box confirming that she has "no problem" attending to her personal care. (*Id.* at 274). Every day, she tidies her home, washes laundry, cleans dishes, and makes the bed. (*Id.* at 275). It takes her up to two hours to complete these tasks, with "small sit down breaks." (*Id.*). She also stated that she goes grocery shopping every week for at least an hour, (*id.* at 276); visits her family and friends, (*id.* at 277); and goes to the gas station, church, and the bank "on a regular basis," (*id.*).

Roberson completed the assessment again in 2015, but her responses changed. (*Id.* at 289). She stated that could no longer attend to her personal hygiene because she was dizzy and "off balance all the time," (*id.* at 290), and could only walk for three minutes before needing a break, (*id.* at 293). Still, she stretches, watches television, cleans dishes, and washes laundry. (*Id.* at 290).

The ALJ ultimately determined that these assessments went against other evidence on the record. (*Id.* at 21). The ALJ noted that, at the time of the alleged onset date, Roberson "reported that her symptoms were significantly better"; that her physician told her "to return only as needed

should symptoms return"; and that she "did not return to her surgeon in 2015." (*Id.*). The ALJ then acknowledged that Roberson's symptoms *did* return in 2016 and that an "MRI showed evidence of recurrent disc herniation . . . ." (*Id.*). The ALJ examined Roberson's medical records and recognized that she "had continued symptoms of left weakness and left foot drop, and a . . . electromyogram showed evidence of L5 radiculopathy." (*Id.*). But the ALJ also noted that Roberson "reported complete resolution of her L5 radicular pain, and significant improvement in her left foot drop and weaknesses" after the third surgery. (*Id.*). And when Roberson began complaining of pain again in 2017, medical records showed that "no foot drop was noted and [her] gait and station were normal." (*Id.*). Viewing the evidence as a whole, the ALJ found that although Roberson still "has some limited range of motion," her symptoms have greatly improved and "her strength and sensation appears intact." (*Id.* at 22). The ALJ therefore determined that Roberson "appears capable of performing a range of light work despite her ongoing lower back pain, with some additional postural and environmental restrictions to prevent exacerbation." (*Id.*).

Along with the medical evidence, the ALJ also considered Roberson's daily activities and determined that they "are inconsistent with debilitating conditions and allegations that she has been unable to work." (*Id.* at 23). This included Roberson's admissions that she is generally "independent in self-care and capable of performing daily tasks and household chores" such as washing laundry, preparing meals, and spending time with others. (*Id.*).

Finally, the ALJ's Step 4 analysis included a weighing of expert opinions. (*Id.*). Since the state agency medical consultants rendered their opinions *before* Roberson's second and third surgeries, the ALJ scrutinized them more heavily, determining that Roberson is "more limited than determined by these consultants" and "should be precluded from hazards and excessive vibration to prevent exacerbation of her symptoms." (*Id.*). The ALJ also gave "little overall weight to the

post-surgical instructions and limitations" provided to Roberson after her surgeries because they "are impliedly temporary restrictions." (*Id.*).

In the end, the ALJ found that Roberson can still perform light work, including her previous job as a housekeeper. (*Id.* at 25–26). The ALJ therefore concluded that Roberson "has not been under a disability, as defined in the Social Security Act . . . ." (*Id.* at 27). Because the Appeals Counsel denied review, the ALJ's decision became the final word of the Commissioner of Social Security. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Roberson then appealed to this Court under 42 U.S.C. § 405(g), which authorizes judicial review of "any final decision of the Commissioner of Social Security."

## II.   LAW & ANALYSIS

The ALJ's decision was supported by substantial evidence and exhibited the level of thoughtfulness expected of the Commissioner of Social Security. The decision reflected a thorough review of the evidence, addressing Roberson's medical history, testimony, and subjective complaints. The ALJ also weighed the consultants' opinions with a level hand. Even if a reasonable mind could have evaluated the record differently, the ALJ built a logical bridge from the evidence to the conclusion that Roberson is not disabled. The decision must stand.

### A. Legal Standard

In reviewing the Social Security Administration's benefits decisions, the Court treats its findings as conclusive "so long as they are supported by 'substantial evidence.' " *Beistek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). A decision is supported by substantial evidence if it contains sufficient evidence to support its factual determinations. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Put differently, *substantial evidence* means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). This is a very deferential standard of review. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "It is the responsibility of the ALJ, not the reviewing court, to resolve conflicting evidence and to make credibility determinations." *Brewer v. Chater*, 103 F.3d 1384 (7th Cir. 1997). The Court must only determine "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).

### B. The Weight Given to Roberson's Subjective Complaints Turned on Substantial Evidence

An ALJ examines the entire case record when considering the intensity, persistence, and limiting effects of an individual's symptoms. SSR 16–3P, 2016 WL 1119029, at *4 (Mar. 16, 2016). This includes the objective medical evidence, the individual's statements, statements and other information provided by medical sources and other persons, and any other relevant information in the individual's case record. *Id.* But not every factor is relevant in every case; an ALJ need only discuss those factors that are "pertinent to the evidence of record." *Id.* An ALJ may also consider the frequency of the claimant's complaints, the frequency of the claimant's attempts to receive treatment, and, if the claimant did not seek treatment, then why not. *Id.* Ultimately, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* An ALJ's failure to adequately explain a credibility finding by discussing specific reasons supported by the record is therefore grounds for reversal. *Terry v. Astrue*, 380 F.3d 471, 477 (7th Cir. 2009). That said, the Court will only overturn an ALJ's credibility finding if it is patently wrong. *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018).

Roberson contends that the ALJ failed to explain how her testimony about her daily activities conflicted with the medical evidence. At bottom, Roberson argues that the ALJ erred by not addressing *how* she performed her daily activities. For example, the ALJ noted that Roberson was capable of "attending to her personal needs, preparing meals, performing household chores such as cleaning and laundry, shopping in stores, watching television, spending time with others, and using the Internet." (Tr. 20). But although Roberson concedes that she performs household chores, she can only do them for "1 to 2 hours per day with small sit down breaks." (Pl.'s Brief 12). She therefore maintains that the ALJ's synopsis of her daily activities was merely conclusory and failed to acknowledge the way she performs those tasks. The Court disagrees.

Roberson's argument hinges on an inaccurate reading of the ALJ's decision and the controlling legal standard. First, Roberson contends that the ALJ erred by not "analyz[ing] all of the factors required under SSR 96-7p." (Pl.'s Brief 11). But the Social Security Administration superseded SSR 96-7p with SSR 16-3p, which clarifies that ALJs need only address *relevant* factors. The ALJ's decision to discredit Roberson's testimony was not merely "because no medical evidence supported" her suggested limitation, as Roberson suggests. (*Id.* at 11). Rather, it was because her symptoms were "not entirely consistent with the medical evidence *and other evidence in the record*," (Tr. 21) (emphasis added). Indeed, along with objective medical evidence showing that the third surgery succeeded, the ALJ pointed to other factors, such as Roberson's statement that she experienced "significant improvement" after her 2016 surgery and her physician's directive to return "as-needed." (*Id.* at 21–22).

The ALJ also considered Roberson's hearing testimony. After waking up, Roberson bathes, cleans dishes, washes laundry, and watches television. (Tr. 54–55). *Cf. Minnick v. Colvin*, 775 F.3d 929, 936–37 (7th Cir. 2015) (finding that an ALJ erred in assessing the claimant's credibility

by using boilerplate language and not meaningfully reviewing the evidence). True enough, " '[a]n ALJ cannot disregard a claimant's limitations in performing' daily activities." *Mauser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016) (quoting *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009)). But rather than point to her recent sworn statements, Roberson directs the Court to assessments submitted three-to-four years prior that allege "difficulty with common functional abilities including lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs." (Tr. 20). Still, the ALJ explicitly discussed those assessments at the onset of the Step 4 analysis. (*Id.*). And after dedicating the next several pages to revealing several sources of seemingly contradictory evidence, the ALJ ultimately determined that Roberson's outdated assessments did not accurately depict the intensity of her symptoms. (*Id.* at 21–25). This included medical evidence, physicians' notes, and Roberson's own statements. (*Id.*). It is not for this Court to reweigh the evidence, only determine whether the ALJ supported the decision with substantial evidence and proper application of the governing law. And after reviewing the administrative transcript, the Court finds that the ALJ's credibility determination was not patently wrong.

### C. The Weight Given to the Consultative Examiners' Opinions Turned on Substantial Evidence

An ALJ may order a consultative examiner to analyze a claimant "when the record as a whole is insufficient to support a determination . . . ." 20 C.F.R. § 416.919a(b). Because medical records often provide little guidance about whether a claimant can work, consultants' familiarity with the administrative process can prove helpful "to secure needed medical evidence." *Id.* "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record . . . ." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). But "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical

diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 772, 728 (7th Cir. 2018).

Roberson challenges the ALJ's decision to give "some weight" to the assessments of the state agency medical consultants. She argues that the consultants' opinions were unreliable because they were prepared before she underwent two more back surgeries, especially since "[t]he updated records . . . show the lack of improvement and the need for additional surgeries." (Pl.'s Brief 14). Roberson therefore contends that the ALJ "played doctor" by only selecting opinions that supported her conclusion while disregarding evidence that suggested disability. (*Id.*). The Court disagrees.

Again, Roberson ignores a plain reading of the ALJ's decision. The ALJ only gave "some weight" to the consultants' opinions, acknowledging that although they "generally appear supported by the record as of the time they were rendered," they were outdated because Roberson had "since undergone two more operative procedures . . . ." (Tr. 23). The ALJ therefore found that Roberson is "*more limited* than determined by these consultants." (*Id.*) (emphasis added). The ALJ then described how Roberson's "slight left lower extremity weakness" precludes her "from hazards and excessive vibration to prevent exacerbation of her symptoms"—a limitation not found by any of the examiners. (*Id.*). The ALJ's decision was hardly a wholesale adoption of the consultants' opinions; it recognized their deficiencies and gave them limited weight. The ALJ was not "playing doctor" simply because Roberson disagrees with the conclusion.

### D. The ALJ Properly Considered Roberson's Applications as Seeking an Open Award

A claimant can argue that although he was once disabled and entitled to benefits, she has since recovered. The law provides that if the claimant was indeed disabled for a period of at least twelve months, then he is entitled to Social Security benefits for that period. 20 C.F.R. § 404.320.

This is called a "closed period" of disability. *See* Dianna Cannon, 1 Soc. Sec. Disab. Claims § 8:9 (2019).

Roberson argues in one sentence that the ALJ erred by "fail[ing] to consider whether [she] was disabled for a closed period . . . between January 2015 and August 2016." (Pl.'s Brief 10). But nothing in the record suggests that Roberson sought benefits for a closed period of disability. If anything, her initial application explicitly stated that she did *not* claim a closed period. (Tr. 241). And her Notice of Amended Onset made no indication that was changing. (*Id.* at 240). What's more, "perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). In other words, the Court will not remand the ALJ's decision based on an unsupported, one-sentence allegation.

### III. CONCLUSION

The Court **AFFIRMS** the Commissioner of Social Security's disability decision.

**IT IS SO ORDERED.**

**Dated: Wednesday, June 10, 2020**

S/J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**